UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JEAN-PHILLIPE PIBOUIN,

               Plaintiff,                            **MEMORANDUM & ORDER**
                                                 **09 CV 3336 (DRH)(AKT)**

     -against-

CA, INC. f/k/a COMPUTER ASSOCIATES
INTERNATIONAL, INC., STEVE PERLMAN,
CLARE CUNIFFE, GREG CORGAN, GEORGE
FISHER, BERNADETTE NIXON, in the Official
and Individual Capacities Pursuant to New York
Executive Law 296,

               Defendants.
--------------------------------------------------------X

**APPEARANCES:**

**Scott Michael Mishkin, P.C.**
Attorneys for Plaintiff
One Suffolk Square, Suite 240
Islandia, New York 11749
By:    Erik McKenna


**Sheppard, Mullin, Richter & Hampton LLP**
Attorneys for Defendants
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
By:    Jonathon Stoler
        Eric Raphan


**HURLEY, Senior District Judge:**

       Plaintiff brings this employment action pursuant to New York Human Rights Law, N.Y.

Exec. Law § 296 ("NYHRL"), alleging that defendant discriminated against him based on his

marital status and national origin.  He also brings claims for unpaid commissions based on New

York Labor Law ("NYLL") § 190, *et seq.* and state equitable remedies, and for unpaid

severance.[1]  Now before the Court is defendants' motion for summary judgment.  For the reasons set forth below, defendants' motion is granted and plaintiff's claims are dismissed.

## BACKGROUND

Plaintiff, who is of French descent, began his employment with CA, Inc. ("CA") in 1987. (Am. Compl. ¶ 45.) After resigning in 1990 to work for a competitor, he returned to the company in 1997 and was assigned to its Islandia, New York office. (Am. Compl. ¶ 45; Deposition of Jean-Phillipe Pibouin ("Pibouin Dep.") 41-44.)  In 1999, he was promoted to Regional Vice-President in the Global Accounts Group, (Pibouin Dep. 54), and two years later, relocated to Manhattan to take on a sales-manager position.  Following a restructuring at the company in 2004, plaintiff was reassigned as an Account Director (Pibouin 95-101) where he reported to a former fellow sales manager, Steve Perlman (Pibouin 103-04).  At each of these changes to his position, plaintiff was offered salary and bonus packages in line with similarly situated employees with the same title. (Affidavit of Anjali Jamdar ("Jamdar Aff.") ¶¶ 19-21.)

In 2005, Perlman gave plaintiff a year-end performance review in which he was determined to have "Partially Achieved Expected Results." (Performance Appraisal, attached to the Affidavit of Jonathon Stoler ("Stoler Aff.") as Exhibit S.)  The review noted plaintiff's difficulty adjusting to his new position and encouraged him to "evolve as the new business model evolves." (*Id.*) The review also stated that his team was unable to close on a deal with "AXA" and that "virtually all of his business" came from one client. (*Id.*) Around the same time,

---

[1] As will be discussed in more detail *infra*, because plaintiff's severance claims are preempted by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), plaintiff's preempted severance claims form the basis of federal jurisdiction over this case.

a representative from AXA requested that plaintiff be removed as CA's representative on their account. (Plaintiff's Counter-Statement of Defendants' 56.1 Statement ("56.1 Stmnt.") ¶ 46.)

In April 2005, Clare Cunniffe took over for Perlman and became plaintiff's supervisor. (Deposition of Clare Cunniffe ("Cunniffe Dep.") 16-19.) Cunniffe's mid-fiscal-year review of plaintiff's performance in December 2005 was also less than satisfactory. (56.1 Stmnt. ¶ 53; Stoler Aff. Ex. V.) In January 2006, Cunniffe prepared an "Action Plan for Performance" for plaintiff, setting forth goals for plaintiff to meet "in order to demonstrate an acceptable level of performance." (56.1 Stmnt. ¶ 55; Stoler Aff. Ex. U.)

In March 2006, plaintiff was given his fiscal-year 2006 performance review with an overall rating of "Partially Achieved Expected Results" (Stoler Aff. Ex. W) – the same rating he earned on his final review for fiscal year 2005, (56.1 Stmnt. ¶ 57; Stoler Aff. Ex. S). The Review identified a number of shortcomings by plaintiff in the same areas that Cuniffe had identified in her "Action Plan" as needing improvement.

On March 1, 2006, plaintiff attended a sales meeting at the company's office in Manhattan. Perlman was among those in attendance. As the group began discussing a client with an Indian accent, Perlman stated "I hate people with strong accents." (56.1 Stmnt. ¶ 61.) Plaintiff, who has a French accent, contends that Perlman was looking at him as he said this. (56.1 Stmnt. ¶ 61; Am. Compl. ¶ 95.) On several other occasions, and on unspecified dates, Jennifer Foulides, a coworker of plaintiff's, witnessed employees, including Perlman, making fun of plaintiff's accent when he was not around. She also testified, again absent any temporal reference points, to witnessing Perlman and others say to plaintiff "speak up, I cannot understand you" when he was speaking English. (Deposition of Jennifer Foulides ("Foulides Dep. 112-15.)

In April 2006, plaintiff was demoted from Account Director to Sales Executive at a salary in line with other sales executives. (56.1 Stmnt. ¶¶ 63-64.)

On May 7, 2006, plaintiff sent an email to Andrew Goodman, the company's Executive Vice President for Global Human Resources, alleging that he had experienced "negative and disparate employment treatment," notifying him of Perlman's comment at the March 1, 2006 meeting, and raising the question "what are the real reasons underlying my deteriorating situation at CA." (Email dated 5/7/2006, attached to Stoler Aff. as Exhibit X.) An investigation followed, which ultimately determined plaintiff's concerns to be without merit. (56.1 Stmnt. ¶¶ 69, 74.)

Beginning in February 2006, the company's sales group instituted a "reduction in force." (56.1 Stmnt. ¶ 75.) Perlman, as Regional Manager, was responsible for recommending employees within his region for layoffs. (56.1 Stmnt. ¶ 79.) Plaintiff was among "several" sales executives recommended by Perlman for termination under the company's retrenchment plan, (56.1 Stmnt. ¶ 81-82), and was informed that defendants were letting him go on September 7, 2006. (56.1 Stmnt. ¶ 83.) The company offered plaintiff a severance package in exchange for a general release, but plaintiff refused to sign the release and therefore did not receive any severance payments. (56.1 Stmnt. ¶ 84-87.)

## DISCUSSION

### I.   LEGAL STANDARD

Summary judgment should be granted where the pleadings and admissible evidence offered to the Court demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). An issue of fact is genuine if the

"evidence is such that a reasonable jury could return a judgment for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Further, the relevant governing law determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Accordingly, where the undisputed facts demonstrate the union of all the required elements of a cause of action and no reasonable juror could find otherwise, the plaintiff is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existent of an element essential to that party's case.").

A party may defeat a motion for summary judgment only "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Roe*, 542 F.3d at 36 (quoting *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998)). The non-movant must advance "more than a scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson*

*v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (citing FED.R.CIV.P. 56(e)).[2] Conclusory

statements in affidavits or allegations in the pleadings are therefore insufficient to defeat a

motion for summary judgment. *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).


## II. MARITAL STATUS

Plaintiff's first claim for relief alleges that defendants discriminated against him due to

his "marital status to Sophie Pibouin," who was a fellow employee at CA. (Am. Comp. ¶ 60;

Pibouin Dep. 12-14.) NYHRL prohibits discrimination in the workplace based on, *inter alia*, an

individual's "marital status." N.Y. Exec. Law § 296(a)(1). However, there is no protection

afforded under NYHRL regarding one's marriage to a particular person. The relevant provision

relates to the employee's "marital status" not his or her "marital relationships." *Manhattan Pizza

Hut, Inc. v. New York State Human Rights Appeal Board*, 51 N.Y.2d 506, 512, 415 N.E.2d 950

(1980). Therefore, under this provision, an employer is only prohibited from imposing an

adverse employment action on an individual employee "because he or she is single, married,

divorced, separated or the like," but not because of the identity of the employee's spouse. *Id.*;

*see also Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 490, 754 N.E.2d 1099 (2001); *Hudson View

Properties v. Weiss*, 59 N.Y.2d 733, 735, 450 N.E.2d 234 (1983).

Plaintiff's opposition brief nevertheless argues anew that he was discriminated against

not so much because he was married to Sophie Pibouin, but because he was married to a fellow

employee of CA. (P's Memo at 4.) To further this argument, he compares himself to three other

"similarly situated salesmen" who are also married to fellow CA employees, and who "prospered

and never experienced discrimination on the basis of their marital status." (*Id.*) The logic applied

---

[2] The cited portion of Fed.R.Civ.P. 56(e) was renumbered as Rule 56(c)(4) as part of the
amendments to Rule 56 effective December 1, 2010

here is elusive. It is not at all clear to the Court how a showing that similarly situated individuals within the *same* class enjoyed better treatment than plaintiff in any way advances his claim of disparate treatment based on being married to a co-employee at CA. If anything, this comparison undermines plaintiff's theory. Furthermore, plaintiff fails to show any authority for the recognition of a protected sub-class under NYHRL consisting of individuals married to fellow coworkers.

Summary judgment is therefore granted as to plaintiff's marital status claim.


## III. NATIONAL ORIGIN

Plaintiff's second claim alleges discrimination pursuant to NYHRL based on his national origin as a person of French ancestry. In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). This standard was further refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11 (1993).

Discrimination claims under NYHRL are analyzed under this same *McDonnell Douglas* burden shifting formula. *See e.g., Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.1 (2d Cir. 2008)("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims."); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 819 N.E.2d 998, n.3 (2004).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to

articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination *vel non*," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal," *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. June 9, 2004) (Summary Order). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment

generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

### a. Plaintiff's Prima Facie Case

To establish a prima facie case of discrimination based on national origin, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008); *see also Tomassi v. Insignia Fin. Group, Inc.,* 478 F.3d 111, 115 (2d Cir. 2007)(The prima facie elements for NYHRL and Title VII claims are the same). Defendants contest only whether plaintiff meets the second and fourth elements.

### i. Job Performance

As to the second element, defendants cite what they characterize as plaintiff's steadily declining job performance. (Ds' Mot at 19.) Specifically, they reference the fact that plaintiff was removed from the AXA account at the client's request, that plaintiff was furnished with three performance evaluations and an "Action Plan" that highlighted shortcomings in his performance, and that plaintiff had to be reassigned from Account Director to Sales Executive. (*Id.*)

These facts, however, more appropriately speak to the question of whether defendants had a legitimate, non-discriminatory reason for plaintiff's termination. Plaintiff's burden on this second element is to "show only that he possesses the basic skills necessary for performance of the job." *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)(internal quotes and alterations omitted). In fact, it is it is "error to find that plaintiff has not established a prima facie case merely because employer was dissatisfied with plaintiff's performance." *Chukwurah v. Stop & Shop Supermarket Co.*, 354 Fed. Appx. 492, 494-95 (2d Cir. 2009)(citing *Slattery*, 248 F.3d at 91). The fact that plaintiff has worked for CA since 1997 in substantially similar, or higher, positions than the one held at the time of his termination is enough in itself to establish that he was qualified for the job. *See Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001)("[W]hen, as in this case, the employer has retained the plaintiff for a significant period of time and promoted her, the strength of the inference that she possesses the basic skills required for her job is heightened.")

### ii. Inference of Discrimination

Defendants also argue that plaintiff cannot make her prima facie case on the fourth element because, they aver, the "only" factual allegation pertaining to discrimination is

Perlman's statement at the March 1, 2006 meeting that he "hate[s] people with strong accents." (Ds' Memo at 20.) However, defendants fail to mention other facts which plaintiff proffers as creating an inference of discrimination:[3] (1) Perlman, among others, "would make fun of JP's accent when he was not around" (Foulides Dep. 112); and (2) these same individuals, including Perlman, would say to plaintiff: "Speak up. I cannot understand you," when plaintiff was speaking English. (Foulides Dep. 114-15.)[4]

Granted, these two additional proffers have been advanced absent any hint of when they occurred, and absent any indication that at the time of the subject utterances, the speakers were decisionmakers. As to Perlman, however, a trier-of-fact could conclude that the discriminatory animus claimed to be evidenced by the additional charged conduct—even if that conduct occurred prior to his ascension into the decisionmaker ranks—continued to exist after his promotion and, thus, those instances lend some, albeit scant support for plaintiff's claims based on his national origin. In any event, given plaintiff's "minimal" prima facie burden to show an inference of discrimination, it will be assumed that he has met that standard. *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)("[C]ircumstances that give rise to

---

[3] Defendants argue in their brief that "[t]hroughout this case, Plaintiff has repeatedly and consistently alleged that the March 2006 comment is the only comment upon which he bases his national origin claim," and that plaintiff should therefore be "precluded" from offering testimony from Foulides. (Ds' Memo at 27 n.22.) However, defendants provide no legal basis for the Court to disregard this evidence, which, notably, has been provided by *both* sides. Furthermore, although plaintiff testified at deposition that Perlman's comment served as the only factual basis for his claim that Perlman discriminated against him due to national origin, plaintiff's deposition was taken on July 14, 2010, before Foulides gave testimony on October 22, 2010 regarding conduct that occurred "when he was not around," and which plaintiff arguably may not have known about.

[4] Plaintiff also cites Foulides's testimony that others would tell him to "speak English" when he was already doing so, (Foulides Dep. 87), and that he did not have a "grasp of the English language," (*id.* 115). However, this testimony either does not indicate who made the comments to plaintiff, or it identifies the speaker as someone who did not have any decision-making authority regarding plaintiff's adverse actions. Therefore, in neither event do these comments support plaintiff's national origin claim.

an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus.")(citing *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)).

### b. Defendants' Legitimate, Non-discriminatory Rationale

Having resolved plaintiff's need to establish a prima facie case in his favor, the inquiry turns to defendants' proffered legitimate, non-discriminatory reasons for plaintiff's demotion and termination. Defendants have advanced a sufficient basis in that regard through evidence of plaintiff's declining job performance leading up to the adverse actions in question. *See, e.g., Gregory*, 243 F.3d at 696 ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."); *Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 543-44 (S.D.N.Y. 2004) (concluding that misconduct, poor performance, and violation of employer's rules and procedures are legitimate, nondiscriminatory reasons for termination).

Plaintiff's declining performance was first noted in the review given by Perlman in plaintiff's year-end review for fiscal year 2005. (Stoler Aff. Ex. S.) The review is not entirely negative; it does indicate that plaintiff is a "conscientious worker . . . willing to go the extra mile to accomplish his tasks." (*Id.*) Nevertheless, the review delivered an overall rating of "Partially Achieved Expected Results" and criticized plaintiff's trouble adjusting to the company's new management structure in which he had to share responsibilities with fellow sales executives. The review also noted his lack of success selling new products to existing clients, and his reliance on a single client to meet most of his sales goals.(*Id.*) Shortly after this review, AXA requested that

plaintiff be taken off their account. (Deposition of Bernadette Nixon 52-53, attached to Stoler Aff. as Ex. F; Perlman Aff. ¶ 12.)

Plaintiff's subsequent mid-year review in December 2005 only gave plaintiff a rating of two or three out of four[5] on all of his review categories. (Stoler Aff. Ex. V.)  The "Action Plan," developed by Cuniffe in January 2005, identified specific goals that plaintiff was required to reach in order to "demonstrate an acceptable level of performance." (Stoler Aff. Ex. U.)  These goals included spending more face time with clients, developing a better understanding of the clients' use of technology, developing a better understanding of the technological trends in the financial industry generally, and using these understandings to propose new CA solutions to existing clients. (*Id.*)

The fiscal year 2006 year-end review issued in April 2006 documented plaintiff's shortcomings in each of the areas outlined in the Action Plan.  The review also gave plaintiff an overall rating of "Partially Achieved Expected Results," and, once again, issued ratings of only two or three out of four in every category. (Stoler Aff. Ex. W.)

Based on this evidence of plaintiff's worsening job performance leading up to his demotion and termination, defendants have met their burden of demonstrating a legitimate, non-discriminatory reason for their adverse employment actions against plaintiff.


### c.  Pretext

The burden now shifts back to plaintiff to demonstrate that defendants' proffered reasons for demoting and terminating him are pretext for discrimination based on his national origin.

---

[5] CA's performance-appraisal format offers the reviewing manager four rating levels in which to evaluate an employee in a number of categories: "not effective," "somewhat effective," "effective," and "very effective." (Stoler Aff. Ex. V.)

Plaintiff first proffers that on unspecified dates, Perlman, and others, said to plaintiff, "Speak up. I cannot understand you," when plaintiff was speaking English. It is difficult to see how this statement provides any meaningful support for plaintiff's case for discrimination. The language of the comment itself does not implicate plaintiff's national origin so much as it implicates the volume of his voice or the enunciation of his words. True, these individuals may not have been able to understand plaintiff because he had a French accent, but Perlman's comment does not, in and of itself, reflect discriminatory animus flowing from plaintiff's failure to be understood. It would be inappropriate to infer national origin bias from a request for plaintiff to speak up or to speak with greater clarity.

As to Perlman's comment at the March 1, 2006 meeting, the words themselves do not necessarily raise the specter of discriminatory animus. Perlman merely states that he "hates people with strong accents." One need only consider the case of a native-born American with a strong regional accent to conclude that his statement does not automatically implicate one's national origin or identity. Moreover, Perlman made the statement during the discussion of a client with a strong Indian accent, suggesting that if Perlman indeed harbored some form of bias, it was against those of Indian descent. However, plaintiff also testified that Perlman looked directly at him when he made the comment. Seen in this context, an inference could be drawn that plaintiff was among those with a strong accent that Perlman "hates."

Assuming, *arguendo*, that Perlman held some ill-will towards plaintiff because of his accent, the question naturally arises to what extent that disaffection reflects a discriminatory animus against plaintiff's national origin. Defendants argue against making such a facile connection between accent and national origin. (Ds' Mot. at 26.) Among the cases cited on this point is *Manessis v. N.Y. City DOT*, No. 02 Civ. 359 (SAS), 2003 U.S. Dist. LEXIS 192

(S.D.N.Y. Feb. 10, 2003). There, one of the defendants allegedly stated that "plaintiff speaks too loud and that he has an accent." *Id.* at *23. The court concluded that "[i]t is unreasonable to suggest that a comment about someone speaking too loud, or too much, or with an accent, evidences an underlying bias about that individual's national origin." *Id.* However, the court went on to note that the "comment must be probative of discriminatory intent, *i.e.* a supervisor saying that he does not like an employee's accent, to reflect some bias." *Id.* The latter situation arguably exists in the present case. Viewing the record in the light most favorable to plaintiff, there is evidence to permit the conclusion that, although Perlman's comment was made in reference to an individual of Indian descent, the remark actually reflects Perlman's attitude towards plaintiff and his accent. Moreover, accents are perhaps the most recognizable indication of one's national identity, and "[a]ccent and national origin are obviously inextricably intertwined in many cases." *Rivera v. Baccarat, Inc.*, 10 F. Supp. 2d 318, 324 (S.D.N.Y. 1998)(quoting *Fragante v. City and County of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989)).

Nevertheless, plaintiff must demonstrate a connection between Perlman's alleged discriminatory comment and his adverse employment action. Stray remarks, even by a decisionmaker, without a demonstrated nexus to the adverse action will not defeat a motion for summary judgment. *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir.1998); *Malatesta v. Credit Lyonnais*, No. 03 Civ. 3690 (MBM), 2005 U.S. Dist. LEXIS 30334 (S.D.N.Y. Nov. 21, 2005). When other indicia of discrimination are presented, however, "the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Danzer*, 151 F.3d at 56. Furthermore, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination; . . . the closer the remark's relation to the allegedly discriminatory behavior, the

more probative the remark will be." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).

Perlman's remark here is considered in conjunction with the fact that he also made fun of plaintiff's accent "on several occasions," and with the fact that Perlman was the one who authorized or recommended plaintiff's demotion and termination. However, no dates, approximate or otherwise, are provided for when Perlman allegedly made fun of plaintiff's accent. This leaves the Court only to speculate as when over the course of plaintiff's many years of employment with CA this conduct might have occurred.[6] Without some temporal connection between Perlman's mocking of plaintiff's accent and the March 1, 2006 comment, the comment sits in isolation. In this light, the comment takes on the features of a stray remark that the Circuit cautions against relying on as support for a claim for discrimination.

Also before the Court is evidence that Michael Puglisi, an American-born employee, was also demoted from Account Director to Sales Executive at some date prior to plaintiff's own demotion, and selected for termination under the same "reduction in force" program as plaintiff. (Perlman Aff. ¶¶ 17, 20.) These facts further undermine any argument that the Perlman's remark has any connection to the adverse actions. The Court notes that these two employees were among "several" sales executives who were laid off during this time. Nothing in the record is offered as to the national origin or other characteristics of the other terminated employees. Nevertheless, it is plaintiff's burden to demonstrate pretext. To the extent that the other workers

---

[6] Perlman, for example, has been employed with CA since 1998. (Perlman Aff. ¶ 2.) Although the record reflects that Perlman began supervising plaintiff in May 2004, there is no indication whether these two individuals worked together at the company prior to this date. (*See id.* at ¶¶ 5-8.) Similarly, the only reference to any date in the submitted portion of Foulides's deposition reflects that plaintiff stopped serving as her supervisor at some point in 2005. Absent further evidence, this fact seems to suggest that the witnessed conduct occurred prior to 2005. (Foulides Dep. 110.)

selected for the reduction in force exhibited characteristics that may support plaintiff's claim, he has failed to bring such evidence before the Court.

In the final analysis, the only evidence of discriminatory animus amounts to an apparent stray remark uttered by Perlman on March 1, 2006, supplemented by evidence that Perlman and some other non-identified employees at CA made fun of plaintiff's accent on a number of unspecified dates. Based on this paucity of evidence, no reasonable trier of fact could conclude that plaintiff's adverse employment actions were the result of national origin discrimination. Summary judgment as to plaintiff's national origin claim is therefore granted.

## IV. RETALIATION

Although the Amended Complaint does not bring a separate cause of action for retaliation, paragraph 94 of the pleading states that he "came to learn that in addition to being discriminated against due to his marital status, . . . he was also being discriminate[d] against due to his national origin and later retaliated against for complaining of same." (Am. Compl.¶ 94.) No other mention of a retaliation claim is made in the pleading. Furthermore, no mention of a retaliation claim is made in his opposition brief, despite the fact that his adversaries addressed such a claim in their motion. (*See* Ds' Mot. at 26 n.1.) To the extent that a claim for retaliation was ever asserted, the Court deems it to have been abandoned. *See, e.g., Johnson v. FedEx Home Delivery*, No. 04-CV-4935 (JG)(VVP), 2011 U.S. Dist. LEXIS 142425 at *22 (E.D.N.Y. Dec. 12, 2011)("By failing to respond at all to [defendant's] federal law arguments, the [plaintiffs] have abandoned any federal law claims."); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument

in any way."); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998)(Claims

alleged in a complaint but "not raised elsewhere in the record," are deemed "abandoned" for the

purpose of granting defendants' motion for summary judgment).


### V.   UNPAID COMMISSIONS

Plaintiff brings claims pursuant to NYLL § 190(1) regarding the payment of commissions

he allegedly earned for fiscal years 2005-2007 while employed at CA.  Defendants provide

evidence that each of these commissions was paid in full, and that the calculations on these

commissions were explained to plaintiff after he raised them with CA management and prior to

his termination. (Affidavit of Scott Hughes, *generally*; Stoler Aff. Exs. I-P, GG-LL.)

Particularly noteworthy is defendants' evidence in the form of emails to plaintiff from Scott

Hughes ("Hughes"), a Director of Operations for CA, addressing each of the purported unpaid

commission issues from fiscal year 2005. (Stoler Aff. Exs. CC, KK.)

Plaintiff provides no evidence to counter defendants' proffer.  Plaintiff concedes in his

opposition brief that the "majority" of these commission issues were resolved, while "certain"

others were not. (P's Opp. at 17.)  However, he does not identify which of these "certain" others

remain outstanding.  Rather than isolating the specific deals and transactions for which he

supposedly should have been compensated, his papers merely cite to equally imprecise testimony

from his deposition.  (*Id.* (citing Pibouin Dep. 147-48, 152-60.)  For example, when asked at

deposition, plaintiff was unable to identify a single transaction from fiscal year 2005 on which

defendants still owe him commissions. (Pibouin Dep. 155-56, 158.)  Plaintiff also refers the

Court to Exhibit H, which contains a number of indecipherable records pertaining to deals that

occurred primarily in 2004, but provides no guidance as to what these records mean.  Plaintiff's

brief also does not appear to reference any evidence related to unpaid commissions from fiscal years 2006 or 2007.

Plaintiff's arguments on this claim conclude by stating that he "can only estimate that the total unpaid wages and commissions from those unresolved deals is [] about $5,000."[7] (P's Opp. at 17.) However, discovery is now closed, and such an untethered conclusory statement is insufficient to rebut the evidence offered by defendants.

In sum, given the evidence produced by defendants, plaintiff's failure to identify which commissions remain unpaid, if any, and plaintiff's failure to offer any specific argument as to why those commissions are due, he has fallen woefully short of his burden at this stage. Defendants' motion for summary judgment on plaintiff's claims under NYLL is therefore granted.

## VI.  EQUITABLE CLAIMS

Plaintiff also brings claims for unjust enrichment, quantum meruit and promissory estoppel. These claims, however, are based entirely on his unpaid wages and/or commissions. (*See* Am. Compl. ¶¶ 112, 113, 116, 120; *see also* P's Opp. at 19 ("Here, in light of Plaintiff's numerous commission and wage issues during fiscal years 2004-2007, genuine issues of material fact exist whether Defendants were unjustly enriched, as well as [whether plaintiff may prevail under] quantum meruit or promissory estoppel.").) As plaintiff has failed to provide sufficient evidence regarding the wages and commissions, if any, he is due under NYLL (*see* discussion *supra*), his equitable claims also must be dismissed.

---

[7] This quote is immediately followed by an inexplicable citation to page 233 of his deposition which discusses his failure to sign a release for his severance payment. (P's Opp. at 17.)

## VII.  SEVERANCE

This case first originated in state court in 2007.  It was then removed to this Court based on plaintiff's severance claim, brought under ERISA.  The parties then stipulated to discontinue the ERISA claim—the only federal cause of action in the Complaint—with prejudice, and the case was remanded back to state court.  While in state court, plaintiff filed an amended complaint, in which he reasserted the same severance claim under state law.  Defendants, citing case law that severance claims are preempted by ERISA, removed the case back to this Court.[8] Defendants now move for summary judgment on plaintiff's severance claim because it is preempted by, and arising under ERISA, and therefore barred by plaintiff's previous discontinuance of ERISA severance claims with prejudice.

ERISA's preemption provision states that the federal statute "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).  A claim brought under state law that "merely amounts to an alternative theory of recovery for conduct actionable under ERISA is preempted." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 288 (2d Cir. 1992).  More specifically, severance benefits plans are "employee benefit plans" governed and preempted by ERISA. *Gilbert v. Burlington Indus., Inc.*, 765 F.2d 320, 325 (2d Cir. 1985).  Therefore, "[a]ny claim relating to an employer's severance plan is preempted by ERISA." *Ullrich v. Linotype-Hell Co.*, 187 F. Supp. 2d 68, 73 (E.D.N.Y. 2002)(citing  *Tappe v. Alliance Capital Mgmt. L.P.*, 177 F. Supp. 2d 176, 187 (S.D.N.Y. 2001)).

Plaintiff does not dispute that he withdrew his ERISA claim with prejudice, but argues that he never withdrew his "severance" claim. (*see* P's Opp. at 17.)  In essence, plaintiff contends

---

[8] Because the case had been closed by the Clerk of Court when it was remanded to state court, the action was assigned a new docket number upon its second removal to this Court.

that this is an entirely new claim based on state law. However, the "governing text of ERISA is clearly expansive," *New York State Conf, of Blue Cross and Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995), and "state law is preempted even though it does not refer to ERISA or ERISA plans if it has a clear 'connection with' a plan in the sense that it 'mandates employee benefit structures or their administration' or 'provides alternative enforcement mechanisms,'" *Plumbing Indus. Bd., Plumbing Local Union No. 1 v. E.W. Howell Co.*, 126 F.3d 61, 67 (2d Cir. 1997)(citing *Travelers*, 514 U.S. at 658)). Plaintiff admits in his 56.1 statement that his severance claim refers to a specific severance plan governed by ERISA. (56.1 Stmnt. ¶ 85.) As this claim is clearly preempted by ERISA, and as plaintiff has previously withdrawn his ERISA claim with prejudice, defendants' motion for summary judgment as to plaintiff's severance claim is granted.

## CONCLUSION

Accordingly, defendants' motion for summary judgment is granted and plaintiff's claims are dismissed. The Clerk of Court shall close this case.

**SO ORERED**

Dated: Central Islip, New York
        March 31, 2012                                    _____/s_____
                                                          Denis R. Hurley
                                                          United States District Judge